## SIOMKIN et al. v. FAIRCHILD CAMERA & INSTRUMENT CORPORATION.

### Civil Action No. 7546.

District Court, E. D. New York.

Jan. 30, 1948.

Cravath, Swaine & Moore, of New York City (Harold R. Medina, Jr., of New York City, of counsel), for defendant, for the motion.

Frank Scheiner, of New York City (Emanuel H. Bloch, of New York City, of counsel), for plaintiff opposed.

BYERS, District Judge.

This is a defendant's motion under Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to dismiss the complaint for failure to state a claim upon which relief can be granted (in fewer words, it is a demurrer).

The action is to recover a minimum sum of $250,000.00 and attorneys' fees for alleged violation of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., in that the defendant is alleged to have failed to pay for overtime in accordance with the requirements of the statute.

The defendant manufactures aerial cameras, sextants, range finders, gun fire control instruments, radio compasses, etc., and it is not difficult to infer who its largest customer was during the years 1941-1945, inclusive, although the challenged pleading is silent on that particular subject.

The material allegations of the complaint are concerned with the operation of a bonus system inaugurated April 10, 1940, as of January 1 of that year according to the terms of a prospectus entitled " 'Employee Participation' Plan". It states that it is not to be considered as a substitute for wages or salaries, "but is to be paid in recognition of the value to the company of trained, steady, cooperative employees, and the added effective thought and effort they may put forth to bring additional profits to the Company".

That is a candid statement.

After defining participants and non-participants, as to which no issue is presented, the document reads:

*"Method of Calculating the 'Employee Participation'*

"The payment is to be a percentage rate, to be determined by the Board of Directors, figured on one-half of the total wages or salary received during the last period of continuous employment within the five calendar years immediately preceding the date of payment of the 'Employee Participation'.

"For example, if an employee has been in the continuous employ of the Company for the calendar years 1936, 1937, 1938, 1939 and 1940, and his earnings during that period have totalled $8,000, and assuming the 'Employee Participation' rate were set at 3%, he would on May 1, 1941, receive a check for $120 representing a 3% return for one year on $4,000 being one-half of his total earnings for the five year period.

"As another example, if the same employee had been in the company only during the last three years, and his total earnings during that period amounted to $4,800 he would receive a check for 3% of $2,400 or $72.00.

"It is obvious that length of service up to five years will automatically increase the amount of 'Employee Participation' to be received by any individual."

*"Date of Payment*

"Payments will be made on May first of each year beginning with May 1, 1941 or as soon thereafter as the final figures are available. No earlier date can be safely set due to the necessity of awaiting the certified figures of the auditors covering the earnings of the previous calendar year."

*"General Method of Fixing the 'Employee Participation' Percentage*

"It is first assumed that the actual investor in the Company has the prior right to a reasonable return on his investment, and that such return should be on a basis of not less than 6%.

"It is further assumed that inasmuch as this 'Employee Participation' is not intended as a substitute for wages or salaries which are to be paid for at prevailing rates,

but as an extra inducement for improving the profit of the business, the amount to be distributed shall be a part of those earnings over and above the amount of the reasonable return referred to.

"After this reasonable return is paid, or set aside for stockholders, it is assumed that a portion of any earnings in excess of such reasonable return shall be considered as extra earnings due in part at least to savings, suggestions, improvements and extra thought and effort on the part of employees and that such employees should benefit in proportion to length and continuity of service.

"A careful study of past records indicates that after giving effect to the various changes occurring since the date of organization of the company in 1927, the actual cash investment of stockholders amounts to an average of approximately $14.00 per share on the present outstanding 337,032 shares, or $4,718,448.00.

"It is the present intention of the Directors to declare a rate of 'Employee Participation' which will represent an approximate percentage return in excess of 6% after taking into consideration any additional capital invested in the business either from new investments or from earnings reinvested for the period under review.

"For example, assuming that 1940 net earnings were found to equal 1939 earnings of $1.25 per outstanding share, or $422,744 and that no additional capital was invested during the year, the invested capital for 1940 would be considered as $14.00 per share or $4,718,448.00 and the net earnings of $422,744 would thereby represent 8.96% of same, or 2.96% above the 6% rate. Two and ninety-six hundreds percent would then undoubtedly be fixed by the Directors as the 'Employee Participation' rate.

"However, should it be necessary for any reason to invest $250,000 of additional capital in the business during 1940, the invested capital would be increased by this amount, making total invested capital $4,-968,448. The percentage return on $422,-744 of earnings would then be 8.51% and the 'Employee Participation' rate 2.51%. From year to year the added invested capital from earnings not declared in dividends

but reinvested in the company will also be taken into consideration."

*"Cancellation or Modification*

"Inasmuch as this 'Employee Participation' is primarily based upon receiving and retaining the active cooperation of all employees, its continuation in future years is always dependent upon obtaining such co-operation which should result in a material and steady increase in earnings. It is further dependent upon any special action of Stockholders or Directors and for this reason, future payments beyond that which will be due as of May 1, 1941, cannot be considered a definite fixed policy and the Company reserves the right to cancel or modify the plan as conditions and contingencies may require."

It will be seen that an employee's participation is to be computed upon his "total wages or salary", which necessarily means *all* wages; that is, straight time plus overtime.

Thus 3% upon his total wages involves 3% on his straight time plus 3% on his overtime, and the period embraced in a given computation is one year, and the amount so established is payable in two parts as explained.

If the plan had been in operation but once, namely, for the year 1940, and had then been withdrawn, this lawsuit would never have been undertaken.

The company, however, made payments annually through the calendar year 1945 according to the complaint "in a sum equivalent to six percent of one-half of the *total wages* and salary received by each employee of the Company during the last period of continuous employment within the five calendar years immediately preceding the *due date of payment* for each and every calendar year under the said 'Employee Participation' Plan * * *". (Italics supplied)

It is alleged that each employee for whom this suit was brought became eligible and entitled to participate in the Plan and to the payments and benefits accruing thereunder, in recognition of which the payments were made for each calendar year to and including 1945.

Violation of the law is alleged as follows:

"Despite the foregoing, the Company failed and refused to compute the payments made and distributed by it under" said plan "as a part of the regular rates of pay of the employees, and the defendant failed and refused to include such bonus payments in computing the regular rates of pay of the employees and the overtime compensation thereon, in violation of the Act."

"The employees have not been fully compensated by the Company at the rates of pay for overtime required by the Act."

This seems to mean that the "total wages and salary" of each employee during 1941, for instance, consisted of his or her straight time, plus overtime, plus the said 3% of the wages; which means that what the company set up as a participation in profits automatically assumed the character of wages, although the prospectus declared that it was not a substitute therefor.

It is not alleged in the complaint which was filed December 30, 1946, that in any one year of 1941–1945, inclusive, action of any kind was taken by the employees or their Union, consistent with the position now asserted. Perhaps that is beside the point in the legal sense, but the pleading will be searched in vain for any allegation of protest, action or representation on the part of the employees that the defendant company had failed to compute this distribution of its profits to its employees, on the theory that because they were so paid, they lost their identity as such by some sort of statutory alchemy, and at some unidentified point in time, and by some unidentified process, became merely wages for straight time.

Thus the controversy is narrowed down to the single question that has been stated, and it remains to inquire whether the law itself, the regulations and rulings, or decisions of the Courts indicate the presence of doubtful issues of fact which require the conduct of a trial in order that a correct and just conclusion may be come to.

The plaintiff's brief contains the following:

"The question then resolves itself into whether a bonus payment is to be included as part of the regular earnings of an em-

ployee upon which to predicate his regular rate of pay. Formulated in this general way, the question cannot be answered categorically. In the last analysis, it is the type of bonus which will determine its inclusion or exclusion in arriving at the regular rate of pay."

Attention is then called to a release dated February 5, 1943, issued by the Administrator, addressed to this subject, in which there are two categories of bonus discussed:

"A." This category not now considered since it is purely in the nature of a gift and therefore need not be included in computing regular and overtime pay.

"B. * * *. Other kinds of bonuses falling within this group are bonuses distributed in a certain amount or on the basis of a fixed percentage of the profits of the employer or of his gross or net income. * * * For example, the amount of the payment may vary according to the length of service of the employee, his * * * compensation * * *. Bonus payments of this type will be considered a part of the regular rate at which an employee is employed and must be included in computing his regular hourly rate of pay and overtime compensation."

I should suppose that, despite this administrative pronouncement to the effect that the payment of a sum of money, over and above an agreed compensation, based upon a percentage of profits, might be so contingent in its nature as to preclude a construction which would place it in even a faintly contractual category, such as may be designated by the word "arrange". Cf. Walling v. Richmond Screw Anchor Co., 2 Cir., 154 Fed.2d 780, at page 785. The ascertainment of corporate profits and their allocation still involve the exercise of their functions by the Directors of a corporation at the end of the fiscal year, and I do not understand that the Fair Labor Standards Act purports to enact the contrary in terms or by necessary implication.

█ If this case could be seen to require adjudication of that question, it would have to go to trial, for the administrative interpretation to which attention is drawn is not determinative (Overnight Motor Transp.

Co. v. Missel, 316 U.S. 572, foot-note 17 on page 580, 62 S.Ct. 1216, 86 L.Ed. 1682), and the decision of lawsuits remains the responsibility of the Court.

It appears, however, that, for the purposes of this motion only, and in order to dispose of it upon the assumption that the plaintiff's theory of its claim for relief should be accepted as it is presently presented, the discussion may proceed upon the hypothesis that the defendant's Plan falls within category "B." of the Interpretative Bulletin of February 5, 1943; inquiry then must be made as to whether, within that announcement, the defendant's Plan violates the Act. That is to say, it will be assumed that the employees were encouraged to believe that the Plan would continue in operation until modification or cancellation were to be proclaimed; and that they brought to bear "added effective thought and effort" in the expectation of receiving a share of the company's profits according to the prospectus which has been quoted, during the years 1941–1945, inclusive.

Also, it will be assumed that the employees did this for financial reasons, rather than from other motives which could have been present in the minds of those who felt that much of national moment and of personal attachment was at stake during those years.

The question then comes down to whether this Plan conformed to the quoted release as to "B.", namely, whether this bonus was included in computing the "hourly rate of pay and overtime compensation".

█ In terms the complaint alleges that it was not. But this does not create any apparent issue of fact, because payments each year are said to have been made according to the Plan; it therefore results that the only issue is one of law, namely: Is the Plan in terms and operation a manifest evasion of the Act?

If the bonus had been computed only upon straight time, it would have fallen within the condemnation of Walling v. Richmond Screw Anchor Co., supra, in which it appears that overtime was computed on regular rates of pay, not enhanced by a bonus added thereto by the employer to accomplish increased production.

The plaintiff's brief asserts:

"It is urged that the *Richmond* case is determinative of the issues on this motion."

That cannot be true, since this bonus in precise terms was to be based on *total* wages; therefore the two elements of this aspect of the computation were straight time and overtime, for not otherwise could the total wages and salaries be stated.

That point is made so clear in the defendant's argument that the plaintiff's failure to meet it admits of no inference save that its validity is manifest.

Numerous announcements of the Administrator are quoted by the defendant, from which the following selections are made:

"Wage and Hour Division, February 5, 1945, Release A-13, reprinted in Wage and Hour Manual, Cumulative Edition, 1944-1945, page 1502, it was stated:

" 'No additional overtime compensation need be computed and paid on a bonus, the amount of which is in fact arrived at by taking a pre-determined percentage of the total earnings of the individual employees (both straight time and overtime), exclusive of the "bonus". Where the amount paid to each employee is actually based on a percentage of his total earnings, the "bonus" itself includes the payment of both straight time and overtime.' "

"Rulings and Interpretations under Public Contracts Act No. 3, issued October 1, 1945 (made public January 31, 1946) by the Secretary of Labor, reprinted Wage and Hour Manual, 1946 Supplement, page 169 et seq., read as follows:

" 'Section 42(f):

" ' "Bonuses".

" '(1) Where an employee's "basic rate" of pay is increased by the payment to him of a "bonus", additional overtime compensation must be paid for those workweeks in the bonus period when overtime was worked, unless provision is made for the inclusion of such overtime compensation in the "bonus" payment itself by calculating it on a percentage-of-total-earnings basis. The types of bonuses which increase an employee's "basic rate" of pay and which do not are explained in Release A-13. * * *

" '(2) As explained in Release A-13, * * * no additional overtime compensation need be computed and paid on any "bonus" the amount of which is in fact arrived at by taking a predetermined percentage of the total earnings of the individual employee (both straight time and overtime), exclusive of the "bonus". Where the amount paid to each employee is actually based on a percentage of his total earnings, the "bonus" itself includes the payment of both straight time and overtime.' "

■ The foregoing are consistent with the opinion presently held, that these employees received in each of the years in question, as the complaint alleges, the full and complete compensation that their positions entitled them to, for straight time, and also for overtime, and in addition each received a share of the net profits of the company, computed upon two bases, (a) length of service and (b) total pay (time and overtime), as the financial reward of putting forth efforts that otherwise they might have withheld. That such share in the company's profits was never thought of, by either the company or the employees, as a kind of furtive effort to induce them to accept less for the overtime component of their wages than they were legally entitled to receive, nor was it that in legal effect.

The cases cited by plaintiff are not opposed to this conclusion: Walling v. Garlock Packing Co., 2 Cir., 159 F.2d 44, decides that a bonus voted upon a hypothetical share-holding basis, by reason of its history, should be regarded as one which the employer had arranged to grant regularly, and that the decision below which "would be to free it (the employer) from the statutory requirements for overtime payments" must be reversed.

It ought to be unnecessary to repeat that this defendant's Plan, so far from evading overtime payments, provided a financial distribution based upon them as well as upon straight time.

No case is cited by plaintiff which involves this principle of extra or incentive remuneration, so computed.

Motion granted. Settle order.